Thank you, Your Honor. May I please record Eric Brown for petitioners? And I'll be sharing time with intervenors. I would also like to introduce Ms. Rosabella Rodriguez. And how are you sharing time? I'll have 15 minutes and intervenors will have 5 minutes. Very much so. After a prohibition of more than three decades, the Federal Motor Carrier Safety Administration has begun to authorize Mexico-Dongsao Trucking Company's engaged in long-haul operations away from commercial zones along the U.S.-Mexico border. The problem is that the agency has developed medical conditions imposed by Congress for doing so. I just have a question with the change of administrations and what's going on with that. Does this matter anymore? I think that's a better question for the government, Your Honor. It doesn't matter for purposes of legal claims that we've brought in our petitions before this Court. Because currently the Mexican trucks have the right now to do commercial long-hauling in the United States. They currently have the right to apply for operating authority to the agency. And the agency is, in fact, granting long-haul operating authority that allows the companies to do business throughout the United States away from the commercial zones that they were previously limited to. So the problem is that the agency has a specific requirement that Congress imposed for granting that authority. Congress required that the agency test the safety of those operations. Specifically, Congress required a pilot program to ensure that those operations would not pose a safety risk on U.S. roads and highways. FEMCSA did not fulfill this mandate. Although it did conduct a pilot program, we purported to make a finding as to safety. That conclusion is not supported by the agency. Now, I understand that your position to me that the pilot program did not have enough participants. But what's your statutory basis for arguing that a certain number of couriers had to actually participate in the program? Yes, Your Honors. The 2007 Act, the Appropriations Act, that's signed throughout our briefing, requires that the agency perform a test. A test has to be a valid test. It has to adequately test the safety of operations away from commercial zones along the border. If a test doesn't have sufficient participants to allow the agency to draw a conclusion as to the safety of its operations, then it's no test at all. The logical conclusion of that argument is that the agency could have conducted a test with... As the D.C. Circuit said, isn't the requirement that the pilot program plan be statistically valid? That is the requirement that appears in 49 U.S.C. 31315, which applies general conditions for all pilot programs conducted by the Department of Transportation. But the 2007 Act imposes a separate requirement. It imposes a requirement for a test. And by requiring a test, Congress clearly required a test that would allow the agency to draw some conclusion as to safety. I'll also say that this issue of sample size is not the only issue we've raised. There are all sorts of issues as to the representativeness of that. What if it's not? If it's a statistically valid sample, but it's not containable, then it is malicional to participate. Is that still invalidated? Yes, Your Honor. Well, I think in that circumstance, the agency would have a couple of choices. First, as a condition, this part and parcel of conducting the test that Congress required of the agency, part of that is making sure that the test attracts sufficient participants to yield statistically valid findings. It's a little bit like environmental cases. Everyone always wants to say, well, you should have done it this way, you should have done it that way, and you have a better idea of how you would have liked to have it done. But why shouldn't we just find that Congress committed it to the agency's determination how many carriers to participate in order for the program's results to be sufficient? Why do you get to say how you would have done it? Well, Your Honor, it's not just us. It's also the very watchdogs that the agency and Congress instructed to monitor the pilot program and make a conclusion as to whether or not the number of participants was adequate. So the Inspector General of the Department of Transportation, the Motor Carrier Safety Advisory Committee, also monitored the pilot program and independently came to the conclusion that the number of participants was not sufficient to allow the agency to draw a conclusion as to safety in future operations. So is the standard arbitrary and capricious? I think there are multiple standards, too, Your Honor. So we've actually raised three separate grounds for unlawfulness. There's the general APA standard, by which we're arguing that the agency's decision to draw a conclusion as to safety in Ukraine Operation Authority was arbitrary and capricious because it's unsupported by the record. We're also arguing that the agency's actions are contrary to law because it has not fulfilled the requirement imposed by the 2007 Act. And USC 31315 that I cited earlier, that require a valid test. But I want to respond also to a further response to the question that Judge Wardlaw posed, what was the agency to do? So if the agency was not able, for reasons outside of its control, to attract sufficient participants to draw a statistically valid finding, then it should have prepared a final report and submitted that report to Congress and said, hey, we did what we could, but we couldn't attract enough participants to draw a fine test to safety. And then it's Congress's decision, whether or not they want to lift the requirement to conduct this test or whether or not they want to leave it in place. Well, but the fact, okay, you say this about Congress. Well, so what should we make of the fact that Congress took no action after the, I don't know how you say this, MNCSA, or do we have a sub, or how do we say this? I say the agency, Your Honor. Okay, okay. After the agency and the Secretary's IG submitted the reports, Congress didn't do anything, right? That's true, Your Honor. But the question here is one of congressional intent. What did Congress intend? Congress could have, if they wanted to. It could say the final report isn't valid, but it's sufficient in our eyes, so we're going to remove the door and leave it. It could, Your Honor. Congress has not spoken since the final report was submitted. But Congress did speak when it adopted the 2007 Act. And the question of interpreting what Congress meant when it imposed that requirement, the subsequent actions of subsequent Congresses do not shed light on what a prior Congress intended when it specifically adopted this requirement. In fact, I mean, inaction really isn't a good basis to measure the intent, even of the current Congress. There are lots of reasons Congress doesn't act. One of the basic reasons is that it's simply busy with other things. But back to the question of what the agency was to do in these circumstances, the one thing the agency couldn't do is look at this body of data generated by the pilot crew that its own experts were telling it wasn't sufficient to draw a conclusion as to safety, and nonetheless draw a conclusion as to safety and begin issuing operating authority on that basis. But that's exactly what the agency did in these years. And I want to talk a little bit about that. Are you challenging the design of the pilot program? No, Your Honor, we're not. So the D.C. Circuit decision that the government relies on throughout its briefing was far challenged to the design of the pilot program. But quite clearly, I mean, that decision was issued a year before the current pilot program even concluded.  The representativeness of the data that the agency relied on, necessarily those do not have been an issue in that case before the D.C. So you're relying on the D.C. Circuit's conclusions as to your standing. Are you saying that's, I guess, an issue concluded? Well, Your Honor, the D.C. Circuit decided that we were, we had standing to challenge the design of the pilot program. We think the same reasoning applies here, that we have standing. The D.C. Circuit found that we had standing as a competitor, a competitor of standing doctrine. We think we do. But regardless, we don't think the court needs to go there because we clearly have standing because of the special interests of our members. As we explained in our briefing and in the standing declarations that were submitted to this court, I.B.T.'s members obviously spend a disproportionate amount of time on roads and highways throughout the United States. Anything that compares safety on roads and highways goes to the special interests of I.B.T.'s members. We have standing to challenge agency action that threatens that safety. So with respect to the particular flaws of the pilot program, throughout the three-year term of the program, only 15 Mexican domiciled carriers participated in the program. And in reality, in civil society, it's even worse than these numbers suggest because 80% of the pilot program inspections were for equal to just obscured carriers. The inspector general concluded in no uncertain terms, one cannot project safety performance from a population that may qualify for future long-haul operating authority in the future on the basis of this data. Ironically, although the agency made findings on the basis of the pilot program data, when the data did not support the agency's preferred conclusion, the agency dismissed the available data because of the small sample size. For example, there was only one crash involving a pilot program carrier throughout the pilot program, but there were so few participants in the program that this actually yielded a crash rate higher than that for all U.S. carriers. The agency dismissed these figures. So you're suggesting that the agency has been helping to find a way to let us reach the conclusion that there was safety equivalence based on statistically valid findings because of the tariffs that were being imposed on your captain? I can't speak to the agency's motivations for coming to that conclusion. You just suggested. Well, I think it's certainly the agency's preferred conclusion. This is what the agency wanted to be able to say on the basis of the pilot program. I can't speak to whether it was because of the tariffs or for some other reason. But clearly the agency disregarded the advice that was being given by its own experts, disregarded the analyses that its experts presented to it, and reached a conclusion directly contrary to that of its own experts. What level of difference do we need to give to the agency in this regard? So with respect to particular issues of sample size and data representativeness, I don't think that the agency's conclusions are entitled to any difference where the agency is acting contrary to the recommendations that its experts who were charged with evaluating these very issues through the inspector general. But that's the IP's report. So that's really sensible to your argument. It is, Your Honor. Both the IP's report and the report that was prepared by the Motor Carrier Safety Advisory Committee, the subcommittee of that body that was charged with monitoring the pilot program, have not particularly reached conclusions that are entirely consistent with those of the key and directly contrary to the agency's conclusion that it was able to draw a conclusion as to safety going forward. So we've talked a lot about the sample size issue. I also want to talk about the brevity that I see that I'm running over, and I would like to reserve some time. So with that, I will. Reserve some minutes for yourself, and I'm giving five minutes now to the interveners. Yes. Okay. Good morning, and may it please the Court. My name is Paul D. Cullen, Jr., and I represent the Intervener Owner Operator Independent Drivers Association, a national association of approximately 150,000 small business truck owners and operators around the country. We join in support of the prosecutor's argument on this position. I'd like to focus my argument on one particular issue, and that is FMCSA has never cited any authority to grant exceptions except non-compliance during the pilot program or afterward with the statutory requirement that commercial motor vehicle operators possess a valid CDL under 49 U.S.C. 31302 and 31308. Now, is that issue concluded by the D.C. Circuit Opinion? It is not. The D.C. Circuit Opinion stated only that the agency may accept noncompliance for the purposes of the pilot program, and that's how it read the appropriations riders to give the agency their permission under. Well, why? Is there any difference on that question, whether it's the design or the actual program? Because the D.C. Circuit recognized that the two statutes it recognized may preclude a permanent exemption, but then the two appropriations riders, especially Section 6901, was limited to the pilot program. And that was a very generous reading of those appropriations. Section 6901, the 2007 Act, is a notice requirement. It says, as a condition prior to initiating the pilot program, the Secretary shall publish in the Federal Register a list of the Federal Motor Carrier Safety Laws and Regulations for which the Secretary will accept compliance with the corresponding Mexican law regulation. That's the equivalent part. The reading of that is that it's a notice requirement by the agency. It must describe this. It was a very generous reading by the D.C. Circuit to read that to grant an exemption to an existing statute, which is not favored, especially in appropriations measures. Well, how does the January 2017 memorandum of understanding relating to the smoothing of commercial driver's licenses affect your argument? It doesn't affect it at all. Again, the Secretary, the agency cites no statute, no authority for which it may accept anything less than compliance with the CDL statutes, even especially, and certainly there's no exemption for an international agreement, one that's negotiated between agencies and not even enacted by Congress in this circumstance. Even if the pilot program did show that Mexican motor carriers are as safe as U.S. carriers, FMCSA, if it wants to allow noncompliance with our statute, it must seek a change in the statute. And that is the normal course of a pilot program. The purpose of a pilot program is to test whether or not the alternate forms of compliance are feasible and safe in this circumstance, and then once they've completed that test, then they can determine whether or not changes to the law or regulations. If it's a regulation within its own authority, it may even seek to change those rulemakings. If it's a statute that provides, that it believes provides, that needs to be changed in order to allow alternate compliance, it may use the results of its pilot program to ask Congress or convince Congress that a change is acceptable. If the intervener respectfully requests that the court make the agency's decision and embrace the announced in its pilot program report, that grants a permanent operating authority to 13 pilot program participants and a joint agency from granting authority to additional Mexican domiciled motor carriers without complying with all U.S. statutes and rules, a condition that is embraced by the NAFTA agreement. All right. Thank you. Thank you. All right. Let's go there from the Department of Transportation. And proceed. I'm trying to hear you. Wait a sec. Dana, your mic is muted. Can you hear me now? Yes. That's great. There's no question that as the Inspector General has now, the pilot program participants here are operating safely. And there's no real question that if the Inspector General also found that the agency had this data monitoring and enforcement in place to know whether that was true. Now the structure of the pilot program was thoroughly evaluated and sustained by the D.C. Circuit. The standardized question was decided by the D.C. Circuit. The statute only goes to, as the court noted, the pilot program plan. Congress thought about this in 2007. And it wasn't a surprise that there was a small participation because there hadn't been a huge participation in the prior pilot program. And Congress didn't put this in 2007 in the list of mandatory requirements for the pilot program in 6901B. Instead, it put it in the list of things that it wanted the agency to, the Inspector General to monitor and report. Let me ask you this, counsel, that obviously there has to be some mechanism. You can't be arguing that someone could never challenge a pilot program. Are you arguing that? No, Your Honor. The design of the pilot program is thoroughly tested at the outset, as it was here. Well, what if you had set up a program where you said, okay, I want all the drivers to go and give me a report saying you have no cavities from the dentist. And then you conclude from that that they would be safe drivers. Now, clearly that would be arbitrary and capricious, wouldn't it? You can't just do anything. You can't just do anything. Certainly. So there's no question here that as the Mid-South Committee finally did what we said we were going to do in the pilot program plan. But when we talk about review of a pilot program, that happens really in two steps. That happens at the outset with the review of the pilot program plan. And then if the agency wants to change, if it wants Congress to change a statute, typically what happens in pilot programs is the agency is looking at what would happen if we eliminated a statute or regulation. So if the agency wants Congress to make a change, as against Congress, and the agency itself needs to change, that needs to survive arbitrary and capricious review. This is a bit of a special scene because what Congress said up here is once we completed the pilot program, the background statutes and regulations were still in effect. The agency was required to start accepting applications from the insurance accounts out of motor carriers. And, of course, it makes a lot of sense that Congress set this up this way in the situation where we have a lot of these titanic terrorists heading out of NAFTA, $2.4 billion of them. They were really affecting U.S. businesses as we discussed with our regulators. And Congress said, well, let's make sure that we have the safety monitoring and enforcement working to make sure that these companies are operating safely, that we know what they are, to make sure we aren't authorizing any of it. Well, I said, excuse me, excuse me, I don't know how, you know, how many people did you have in this study, 13? So there were 15 companies, there were 55 trucks traveling 1.5 million miles in the United States through over 4,000 inspections. I don't think that there's any real question that we had the data that we needed to draw conclusions that the participants in the study operated safely. And our conclusion was we have what we need to know that these companies are operating safely, and companies from Mexico can and do operate safely. And our data does absolutely support that conclusion. These companies can operate safely, and the companies that were on the pilot program were operating safely. In fact, they were operating really orders of magnitude more safely than the U.S. and Canadian trucks. Their violation rates were a tiny fraction, which is not a surprise when you look at the really extensive monitoring and enforcement that was set up for these particular carriers. Now, if you want to talk about whether this is a solid test, I just ask the question of what you're testing. We don't need to, and it wouldn't make sense to extrapolate about every motor carrier in Mexico, all 130,000 motor carriers in Mexico are not about to start operating here. What we needed to know through this pilot program, and what we do know, is that we have the procedures in place for authorizing unsafe companies and should some company become unsafe, we have the monitoring in place to take action, to know that there's a problem, and to take action.  MS. MCCARTY No, no, excuse me. With the change of the administration, are you still going ahead and issuing permits, or is there a change? MS. GARRETT Nothing has changed at this point, Your Honor. This Court, the cases issued in this case are still before this Court. So, we have a situation where there are really only a few carriers with the sophistication and the business relationship to operate with a profit in the United States under this regime.  MS. MCCARTY Okay. So, is the Department of Transportation continuing to accept and grant applications from Mexico? I'll talk with Dr. Sealy. MS. SEALY Yes, it is, Your Honor. But there has still not been very much interest in this program. At this point, we have only 18 active carriers. I believe there are 27 that have operated, but the other nine are not operating. So, this is still a very, very small program two years later. So, this is a case where the steel size question comes in, where are these? We want to report to Congress, and Congress has the data. They can decide what to do with it. This is an area in which they have been quite active. MS. MCCARTY Now, let me ask you this. If, let's just assume, if the results of the pilot program showed that Mexico domiciled carriers were not as safe as others on our roads, was the FMCSA free to start reviewing applications and granting long-haul authority? MS. SEALY Yes. So, the background clause required the FMCSA to start accepting applications, but at that point, they would have taken steps to mitigate any safety concerns. We have this very extensive reauthorization safety audit process, and as you can see, I just found that process is working. But, if this were to show... MS. MCCARTY Wait, wait, wait, wait, wait. Wait, wait, wait, wait. We have kind of a delay here. So, if the study had shown that they were not as safe, you still would have gone ahead and if you started, you would still start reviewing applications and granting long-haul authority. MS. SEALY But, so what we would have done is start accepting applications and then looked at our process to figure out what we can do in terms of additional monitoring and further expanding the preauthorization safety audit to make sure that we are not authorizing any unsafe company. But, of course, that was not a concern here because the participants of the pilot program had violation rates that were really tiny fractions of the violation rates of the U.S. and Canadian carriers, right? The drive-by-service rate was less than one-twentieth. The in-wire service rate was less than half. MS. MCCARTY Right. Excuse me, but the opposing parties argued that national average isn't really statistically valid, high average, because of the way that it's determined in the variation among the states. MS. SEALY So, they did make that argument to the agency, but that really is a red herring because the pilot program has outperformed U.S. and Canadian carriers in every state. So, even if you were to compare state-by-state numbers, the pilot program carriers we know would be better than the average in any state. The drive-by-service rates, the pilot program rate was one-sixth, the lowest rate in any state. So, there's really a significant difference here, and that argument, although it's vague, really doesn't add any value. MS. MCCARTY So, if the only data that the Secretary had was from the 13 carriers that participated in the program, would such data be enough for the Secretary to determine that Mexico-domiciled carriers are as safe as others on our roads? MS. SEALY Mexico-domiciled carriers on our roads, yes. So, we're not drawing a conclusion about every motor carrier in Mexico. What we're saying is the carriers here on our roads are operating safely. We have a lot of data as a result of the carriers here on our roads, those 13 or 15. MS. MCCARTY All right, but you're not exactly, you're not answering my question. Okay, my question was, if the only data that the Secretary had was from the 13 carriers that participated in the program, would such data be enough for the Secretary to determine that Mexico-domiciled carriers are as safe as the others on our roads? MS. SEALY Yes, I think it would be enough, and I am trying to answer that question. So, the question that the agency addressed is the Mexico-domiciled carriers on our roads. We do not have the data, and we do not report to make conclusions about the 130,000 carriers in Mexico. But what we do have the data for, and where we do make conclusions, is that the carriers that are here can and do operate safely. MS. MCCARTY So, the conclusion is for the 13, not for Mexico-domiciled carriers in general? MS. SEALY Not for every. MS. MCCARTY I don't know how you can say that, because you just said you had applications from 18, and what you're saying is you can extrapolate from, you're not talking about every Mexico-domiciled carrier. You're only talking about the ones you've allowed to go onto our roads. But you're making the representation that those are here safely based on your study of the other 13, which may or may not overlap, but certainly not 18. MS. MCCARTY So, I think when there were 15, the IG said that that sample was big enough to extrapolate to 18, but I don't think that that is the critical point here of what the agency was trying to do. What the agency was trying to do is make sure that it has the monitoring enforcement in place to make sure that any carrier operating here is operating safely. MS. SEALY You're saying that the statistical flaws that various, that the Inspector General has ever found in your final report are taken care of by the post-license, or post-application grantee monitoring system that you put into place. MS. MCCARTY So, what we said at the time, and what we're saying still, is that what we found in this pilot program is that we can be sure that the carriers operating on our roads are operating safely. And Congress, that was the piece of 6901, the 2007 statute, that was mandatory, was to make sure that the agency had the monitoring enforcement to be sure that the carriers here operated safely. Now, it's not surprising, knowing what Congress did about tax cuts, knowing what Congress did about these retaliatory tariffs and the effect that they were having on U.S. businesses, that Congress said, let's make sure that the monitoring enforcement in place is sufficient and then go forward, let's get out from under these sanctions, you should accept applications and continue this very extensive monitoring enforcement regime that we have in place. This regime is really, there's an extensive characterization of safety on it. It will significantly count on any single U.S. and Canadian carriers. Basically, despite every truck, there will be the safety protocols on the carrier. We inspect the records, make sure that those protocols are actually being followed. We check driver's license, check the driver's records here and in Mexico, check their English proficiency, look in the DHS databases, make sure that drug testing is done in the facility. We accept all the comments in case any member of the public has something to doubt. We verify insurance, make sure the trucks have monitoring safety features, and that's just to get started. Then there's compliance review in 18 months, where carriers have to have a highly safety-rated team, which is, again, different. Councilor, that meets the Secretary's Department of Transportation statutory obligation. Why even do the pilot program? Sure, the statute required us to do a pilot program, and that pilot program was meaningful. Remember, the mandatory portions of the pilot program, the 6901B, largely go to the agency's monitoring and enforcement and making sure that that's working. We did make sure that that's working. And it makes sense that that was the thing that, in this context, Congress really didn't care about. If there are questions about the commercial driver's license issue, which is, I think, not probably part of this case, TIGAR, and anyway, there are good reasons, but no one, including the D.C. Circuit, has run the statute this way in the last 20 years. If we have to address TIGAR, do we issue one or not update? There are TIGAR for two reasons. This wasn't in the petition for review, but also this is a 20-year-old statute, and every carrier operating under the statute, or every driver from Mexico and Canada has been operating under this reading for the last 20 years. Nothing changed as to that in this pilot program. But, you know, in any event, there are really good reasons. We're not worried about the text here. There are very good reasons that, as the D.C. Circuit and everybody else who's read this statute has read it this way for the last 20 years. Are there any further questions? If not, I'm for it. If not, I'm for it. So, I would just like to quickly make a couple of points in response to what the government said. First, and very quickly, as we say, C.S. Bone regulations require that a pilot program include a reasonable number of participants to use statistics valid for victims. We cited this right throughout our briefing, and the government has never responded to it. Second, the government said several times that the pilot program demonstrated that these particular carriers were safe, and it wasn't time to draw a conclusion as to the larger universe of carriers in Mexico. But the purpose of the pilot program, the stated purpose, was to assess the larger universe of carriers and would apply a default call on competing throughout the United States if the agency began to grant such authority. That was what the agency, as far as my Congress was doing, and that's what the agency purported to do in the final report. And the self-watchdog said that it was insufficient to do that. Third, the government raised, was there a host of safety protocols that the agency went through in the conduct of the pilot program and is still doing now with the carriers that I spoke in conversation to. But these problems can't be solved post hoc. Congress required a pilot program to test as a prerequisite to the agency accepting applications and granting operating authority. The agency can't say that, oh, well, something we're doing after the fact cured this deficiency in a legal requirement that we failed to fulfill before we took this action. And finally, Your Honor, I would like to say something about remedy. So under the APA, the appropriate remedy is to set aside or vacate the agency's lawful actions. Obviously, we're asking the court to set aside the grants of operating authority that the agency has issued so far. We're also asking that the court set aside the final report, which is final agency action for all of the reasons described in our briefing, which is the legal prerequisite to the agency's operating authority. The merits analysis as to the legality of both of these forms of agency action is largely the same. So with that, if the court doesn't have any further questions, please. Thank you. Thank you, counsel. The international letter of Teamsters v. DOT is submitted and the session of the court is adjourned until today.
judges: Wardlaw, Gould, Callahan